J-S45031-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: G.C.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1129 MDA 2023 |

Appeal from the Decree Entered July 11, 2023
In the Court of Common Pleas of York County Orphans' Court at No(s):
2023-0011

| | | |
|---|---|---|
| IN THE INTEREST OF: H.M.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1130 MDA 2023 |

Appeal from the Decree Entered July 11, 2023
In the Court of Common Pleas of York County Orphans' Court at No(s):
2023-0012

| | | |
|---|---|---|
| IN THE INTEREST. OF: R.A.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1131 MDA 2023 |

Appeal from the Decree Entered July 11, 2023
In the Court of Common Pleas of York County Orphans' Court at No(s):
2023-0013

J-S45031-23

BEFORE:   BOWES, J., LAZARUS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:          **FILED:  DECEMBER 27, 2023**

A.H. ("Mother") appeals from the decrees entered in the Court of Common Pleas of York County Orphans' Court, which involuntarily terminated her parental rights to her minor children: twins, R.A.R. and H.M.R. (born in September of 2017), and G.C.R. (born in October of 2019) (collectively "the children"),[1] pursuant to Section 2511 of the Adoption Act.[2]  Mother's appointed counsel, Brandy Hoke, Esquire, has filed an ***Anders***[3] brief seeking to withdraw from representing Mother on appeal.  After a careful review, we affirm the orphans' court's decrees and grant counsel's petition to withdraw.

The relevant facts and procedural history are as follows: On April 28, 2022, the York County Offices of Children, Youth, and Families ("the Agency") filed an application for the emergency protective custody of the children.  On

_____

[*] Former Justice specially assigned to the Superior Court.

[1] Mother filed a separate notice of appeal for each decree regarding each child. This Court consolidated the appeals. Father has not filed an appeal from the orphans' court's decrees, which involuntarily terminated his parental rights to the children.

[2] 23 Pa.C.S.A. §§ 2101-2938.

[3] ***See Anders v. California***, 386 U.S. 738 (1967), and ***Commonwealth v. Santiago***, 602 Pa. 159, 978 A.2d 349 (Pa. 2009). The ***Anders*** principles and process have been extended to appeals involving the termination of parental rights. ***See In re V.E.***, 611 A.2d 1267 (Pa.Super. 1992) (extending ***Anders*** briefing requirements to termination of parental rights appeals involving indigent parents represented by court-appointed counsel).

- 2 -

May 11, 2022, the children were adjudicated dependent, and at a status review hearing held on January 26, 2023, the orphans' court changed the goals from reunification with a concurrent goal of adoption to the primary goal of adoption with a concurrent goal of return to parent. Neither Mother nor Father appealed the January 26, 2023, goal change orders.

On January 24, 2023, the Agency filed a petition for the involuntary termination of parental rights as to the children, and the Agency amended the petition on May 5, 2023.  The Agency sought termination pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8), and (b).

On July 10, 2023, the orphans' court held a termination of parental rights hearing at which the children were represented by Christopher Moore, Esquire, as legal counsel, and Daniel Worley, Esquire, as the guardian *ad litem*.  Mother and Father appeared for the hearing, and they were represented by separate court-appointed counsel.  Specifically, Brandy Hoke, Esquire, represented Mother while Thomas Gregory, Esquire, represented Father.

At the hearing, Shari Delafield, who provided services to Father through JusticeWorks, testified she had scheduled visits with Father on June 22, 2023, and June 23, 2023; however, he was a "no show."  N.T., 7/10/23, at 15.  On June 26, 2023, Ms. Delafield arrived at Father's residence unannounced, and Father opened the door.  *Id.*  However, Father was "heightened" and appeared

- 3 -

to have been crying. *Id.* He informed Ms. Delafield that he could not "deal with services today," and he asked her to leave. *Id.*

On June 29, 2023, Ms. Delafield saw Father at a job site in Dillsburg, Pennsylvania, and she informed him that it was necessary for her to view the interior of Father's trailer. *Id.* at 16. Even though Father had refused her past offers to clean the trailer, Ms. Delafield testified she again asked Father if he wanted her to assist in cleaning his trailer. *Id.* Father declined her assistance. *Id.*

Ms. Delafield reminded Father that, since he had reported he started a new job as a painter, she needed his new income information. *Id.* Ms. Delafield testified Father had previously worked at night, but he found that nighttime work "messed with his mental health," so he switched to a day job. *Id.* at 18. She noted Father never provided any verification that he had, in fact, started the new day job as a painter. *Id.* Father provided her with no contact information for the new employer or any pay stubs. *Id.* at 19.

Ms. Delafield testified she did not hear from Father after her June 29, 2023, visit, so she attempted to conduct an unannounced visit on July 5, 2023; however, Father was not at his trailer. *Id.* at 18. She scheduled a visit for July 6, 2023, but Father failed to appear. *Id.* She noted that she had not been allowed in Father's trailer since the last court date on June 21, 2023. *Id.* at 17.

At this point in the hearing, since Mother and Father were both present in the courtroom, the orphans' court directed that Linda Tirado-Lopez from JusticeWorks conduct a urine drug test on both parents. After the tests were completed, Ms. Tirado-Lopez testified Father's urine tested positive for methadone, for which he had a prescription. *Id.* at 23. Mother tested positive for cocaine and methadone. *Id.* at 66. She noted Mother was not in a methadone program for methadone maintenance. *Id.*

Elyse Nangle, a caseworker for the Agency, testified she received the initial referral for the family on April 18, 2022, and she has been the sole caseworker for the family since that time. *Id.* at 26. Ms. Nangle noted that Mother had been incarcerated, and after she was released from prison, Ms. Nangle went to the address where Mother was supposed to be staying. *Id.* No one answered the door at the residence. *Id.* at 27.

She noted that Father had referrals dating back to October of 2017, and he received services until April 2, 2018. *Id.* The referral was for inadequate housing for the children and substance abuse as to both parents. *Id.* When the referral was made, paternal grandmother took the twins, R.A.R. and H.M.R., as a thirty-day emergency caregiver while the parents received services. *Id.* Then, on October 8, 2019, the Agency received a referral that G.C.R. was born positive for buprenorphine, but the case was closed in November of 2019. *Id.*

However, on April 18, 2022, a new referral was made related to Mother's and Father's substance abuse and domestic violence issues. *Id.* at 28. Drug and alcohol services were offered to Mother and Father, but the services were unsuccessful. *Id.* Specifically, on April 28, 2022, Ms. Tirado-Lopez contacted Ms. Nangle and reported she had concerns about Father, who was the sole caregiver for the children, being under the influence. *Id.* at 29. Father could not provide a "warm" urine sample for testing. *Id.* Also, the children were sleeping in excess of eleven hours a day, and Father admitted that he had "medicated them." *Id.* She noted that, as of this time, there was a protection from abuse order in place between Mother and Father. *Id.* Thus, the Agency filed the petition for emergency protective custody, and the children have remained in placement since April 28, 2022, which is approximately fourteen months. *Id.* She noted the children have been adjudicated dependent. *Id.* at 30.

She noted that, at various points, Mother and Father have been homeless, and she has provided them with services. *Id.* She noted Mother's general goals have been to participate in drug and alcohol evaluations, and although Mother initially complied and took methadone, she is no longer attending drug and alcohol treatment. *Id.* at 31. She noted that Mother's whereabouts have been unknown, so she is not aware whether Mother has been receiving methadone. *Id.* She also noted that Mother was "hit or miss" with her required drug and alcohol testing. *Id.* Mother appeared for testing

eight times, and six times she was negative, but each time "there were some issues with the tests." *Id.* In November of 2022, Mother tested positive for methadone. *Id.* at 32. Since February of 2023, Mother's whereabouts have been unknown, she has not cooperated with the Agency, and she did not appear for any drug tests. *Id.*

Ms. Nangle testified that Mother was supposed to participate in domestic violence and mental health treatment; however, Mother never appeared for the treatment. *Id.* Further, Mother was supposed to participate in nurturing parenting classes; however, she missed the initial class. *Id.* at 33. Mother reenrolled in the class, but she missed the first month due to "scheduling issues." *Id.* Mother did not complete the course. *Id.* Mother was supposed to receive in-home team assistance; however, as of February 28, 2023, Mother's whereabouts were unknown by the Agency, so Mother did not receive the service. *Id.* Mother has not maintained a consistent source of income, and Ms. Nangle indicated she "honestly could not remember the last time [Mother] was employed." *Id.* at 52.

Ms. Nangle testified the last time Mother appeared for visitation was on February 28, 2023, and she never progressed past the supervised visit level due to her ongoing concerns of sobriety. *Id.* at 41. She also noted the children had negative behaviors after Mother visited. *Id.* She testified that Mother has made "no" progress with her goals. *Id.* at 37.

Ms. Nangle testified Father's goals included drug and alcohol evaluations, and he has been going daily for methadone maintenance. *Id.* at 34. Father was supposed to comply with drug and alcohol testing, but he has been "hit or miss" with appearing for his scheduled tests. *Id.* Father was directed to submit to hair follicle testing in June of 2023; however, the hair sample provided was too short for proper testing. *Id.* When Father had a hair follicle test in March of 2023, it came back positive for cocaine. *Id.* at 35. Ms. Nangle noted Father cut his hair extremely short after the March 2023 test came back positive. *Id.* at 61.

Ms. Nangle indicated Father was to participate in domestic violence and mental health treatment beginning on March 28, 2023; however, she has received no confirmation that he started the program. *Id.* She noted that, overall, Father's progress with his goals has been "very minimal." *Id.* Regarding Father's residence, which is a trailer, she noted the trailer was "very cluttered" when she last viewed it in June of 2023. *Id.* at 38. When she last visited, she "sank into the floor." *Id.* She opined that the condition of the home was not suitable for the children. *Id.* at 59.

Ms. Nangle testified Father, like Mother, has never progressed from supervised visitation with the children due to the concerns about his sobriety and the children's poor behavior after his visits. *Id.* at 42. Ms. Nangle testified that, after supervised visits with Mother and Father, the children exhibited negative behaviors. *Id.* In this regard, she testified as follows:

The…[initial] foster mom…[reported that] after visits the children would become aggressive, hitting, biting her and other kids in the home, calling her a bitch. They would smear poop on the walls and purposely urinate in their room on the floor. Recently, after visits, they are just very hyper and whiney.

*Id.* at 42-43.

Ms. Nangle testified that all services at the Agency's disposal were offered to Mother and Father, and they never requested any services that the Agency was unwilling to provide. *Id.* at 43. She noted that, during the time the Agency has been involved, Father has paid "$105.00 total for all three children," and Mother has made no financial contribution. *Id.* at 40. She indicated neither parent has provided any direct financial support to any of the foster homes. *Id.* She noted that, throughout the adjudication, neither Father nor Mother have kept her adequately informed as to where they are residing. *Id.* at 39.

Ms. Nangle testified that, since February of 2023, the children have been placed together with the same foster parents, who want to adopt the children. *Id.* at 43, 47. She indicated the children are "happy" and bonded with the pre-adoptive foster parents, and the children do not ask about their biological parents. *Id.* at 48. She testified that during recent visits she asked the children if they want to go home with Mother and Father, and the children have indicated they want to stay with their pre-adoptive foster parents. *Id.* at 49. She noted that, when she first met the twins in April of 2022, they

- 9 -

were "very skinny." *Id.* at 48. However, since being in placement, the twins have "put weight on," became "less hyper," and are "more well-behaved." *Id.*

She noted Mother and Father have attended "a few" of the children's medical appointments; however, they have not been involved with speech therapy for the twins, who have a "significant need" in this area. *Id.* at 43. She also noted that the foster parents took G.C.R. for his scheduled medical appointments, and during one such medical appointment, it was confirmed that G.C.R. has "one kidney, [as well as] severe asthma." *Id.* at 44. Neither Mother nor Father attended the medical appointment where G.C.R.'s kidney irregularity was discussed. *Id.*

Ms. Nangle testified that, during the past twelve months, aside from sporadically attending supervised visitation, Mother and Father have given the children Christmas and birthday gifts. *Id.* However, neither Mother nor Father have made substantial progress toward alleviating the circumstances that led to the original placement. *Id.* For instance, neither Mother nor Father have completed domestic violence and mental health treatment. Additionally, they have not completed various courses as described *supra*. *Id.* at 45. She testified that, despite the history of domestic abuse, Mother and Father continue to have contact with each other. *Id.* Ms. Nangle opined that neither Mother nor Father have been working diligently towards resuming their parental responsibilities for the children. *Id.*

Ms. Nangle testified it would be in the best interest of the children for Mother's and Father's parental rights to be involuntarily terminated. *Id.* at 46. In this vein, she indicated:

> These parents have not successfully completed any goals in the Family Service Plan. These children adore [the pre-adoptive foster parents]. My co-workers in the back and myself saw them last Thursday. They were loving[.] They are very sweet kids.
>
> [The children] need stability and these children need to be able to get to appointments, and especially the girls getting their speech worked on. Mother has been MIA for—since February—
>
> ***
>
> The in-home JusticeWorks has been trying to get into [Father's] home since the last hearing and to complete a budget with no success. So, we have no way to prove stability.

*Id.* at 46-47.

Ms. Nangle testified that, from February 28, 2023, to June 21, 2023, Mother had no contact with the Agency, and in May or June of 2023, the Agency independently discovered that Mother was incarcerated. *Id.* at 61. During this time, Mother did not submit to drug tests. *Id.* She noted Mother has provided no contact information or information as to her residence since she was released from jail. *Id.* at 63.

Attorney Worley, who is the children's guardian *ad litem*, made the following statement to the orphans' court:

> [M]y position is that I agree with the Agency's recommendation. I have seen the children in the home of the current foster parents. They are very happy. They like it there.
>
> They didn't ask me about their [biological] parents when I went to visit them. And the [biological] parents aren't able at this point to be there for them and to have a safe, stable house for

- 11 -

them, and they still haven't—especially Mother is working on her active drug addiction. So, at this point, I feel it is in the best interest to have rights terminated and allow them to be adopted.

***

The children seem to be very close to [the pre-adoptive foster parents]. I asked if they call them mom or dad, and they called them that sometimes. Like, it's "Daddy John" or "Mommy Amy." They are still working on it. They don't want to step on the [biological] parents' toes. But just by living there [the children] naturally look to them as a parental figure. You can tell they are very close.

The children seem happy. They seem really happy.

*Id.* at 69-70.

Attorney Moore, who was legal counsel for the children, indicated as follows:

I have been to the [pre-adoptive foster] home on two separate occasions for about an hour each. I talked to the children. I talked to the foster parents and with them in the room. They are very excited. On both occasions, if I didn't know the facts of this case, I would assume that [the children] had always been there.

As best I can claim, given their ages of 3 and 5, they couldn't get too substantively into [discussion] beyond their intellectual abilities at their age, but based on my observations, they don't want to leave [the pre-adoptive foster home].

*Id.* at 70-71.

Attorney Moore noted that he discussed with the pre-adoptive foster parents whether they would be willing to allow the children to have contact with the paternal grandmother, and they indicated they would do whatever was in the best interests of the children. *Id.* at 72.

- 12 -

Mother testified she does not want the children to be taken away from her, she loves the children, and she wants another chance. *Id.* Mother admitted she was incarcerated from May 28, 2023, to June 29, 2023, and prior to her incarceration she wasn't "living anywhere." *Id.* at 74. She clarified that from February 28, 2023, until her incarceration, she was "hopping from place to place" while relying on friends. *Id.* at 76. She admitted that, since February 28, 2023, she did not call the Agency, get a job, visit the children, or undergo a drug test (except for the positive urine test conducted during the termination hearing). *Id.*

She noted she is currently looking for employment at warehouses, and since her release from prison, she has been living off and on with her parents. *Id.* at 73. She admitted that, after her release from prison, she did not make an appointment for a drug or alcohol evaluation or contact the Agency. *Id.* at 74. She also admitted she has been talking to Father since her release from prison, and he is trying to help her "stay clean." *Id.* at 75. She indicated she got the cocaine and methadone, for which she tested positive during the termination hearing, from people in Harrisburg. *Id.* at 75-77.

Father testified he leases the lot for his trailer, and beginning on June 20, 2023, he began working as a house painter for Keys Painting. *Id.* at 80. He testified he has paperwork proving his employment, but he left the paperwork in his car. *Id.* He has not yet received a paycheck, and the work is sporadic. *Id.* at 81. He indicated that, prior to starting with Keys Painting,

he worked at a warehouse for four months; however, he quit the warehouse job because the nightshift was "taking a toll on him," and if he ever got the children back, he needed to be available during the night. *Id.* at 82.

Father testified he goes once or twice a month for drug and alcohol counseling and meetings. *Id.* at 83. He goes to a methadone clinic three times a week to get his prescribed methadone. *Id.* Father testified he has not addressed his mental health issues, but he does plan on making an appointment to "see somebody for anxiety and depression." *Id.* at 84.

Father admits he has a problem with being "last minute" about his responsibilities, but he loves the children and does not want his parental rights terminated. *Id.* at 86-87. He is "overwhelmed" and is trying to get his life together. *Id.* at 87. He testified he cleaned the trailer; however, he admitted he did not bring any photos or videos to prove he cleaned the trailer. *Id.*

At the conclusion of the hearing, the orphans' court entered its decrees involuntarily terminating Mother's and Father's parental rights under subsections 2511(a)(1), (2), (5), (8), and (b) as to the children. Mother filed a timely counseled notice of appeal, as well as a contemporaneous concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The orphans' court filed a responsive Pa.R.A.P. 1925(a) opinion. Thereafter, on October 20, 2023, Mother's counsel, Attorney Hoke, filed a petition to withdraw her representation, as well as an *Anders* brief.

On appeal, counsel raises the following issues on behalf of Mother (verbatim):

1. Whether the Lower Court erred as a matter of law and/or abused its discretion in finding there was sufficient evidence presented to show that Mother by conduct continuing for a period of at least six months immediately preceding the filing of the petition either evidenced a settled purpose of relinquishing parental claim to the child or has refused or failed to perform parental duties pursuant to 23 Pa.C.S.A. § 2511(a)(1)?

2. Whether the Lower Court erred as a matter of law and/or abused its discretion in finding there was sufficient evidence was [*sic*] presented to show repeated continued incapacity, abuse, neglect or refusal of Mother causing the child to be without essential parental care, control or subsistence necessary for the physical or mental well-being and that the conditions and causes of any incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent pursuant to 23 Pa.C.S.A. § 2511(a)(2)?

3. Whether the Lower Court erred as a matter of law and/or abused its discretion in finding there was sufficient evidence to show that the child was removed from the care of Mother for a period of six months, the conditions which led to the removal continue to exist and Mother cannot or will not remedy those conditions in a reasonable period of time and termination will serve the needs and welfare of the child pursuant to 23 Pa.C.S.A. § 2511(a)(5)?

4. Whether the Lower Court erred as a matter of law and/or abused its discretion in finding there was sufficient evidence that the child was removed for 12 months or more, the conditions which led to removal continue to exist and termination best serves the needs and welfare of the child, pursuant to 23 Pa.C.S.A. § 2511(a)(8)?

5. Whether the Lower Court erred as a matter of law and/or abused its discretion in finding there was sufficient evidence presented that termination is warranted under 23 Pa.C.S.A. § 2511(b)?

- 15 -

***Anders*** Brief at 4-5.[4]

Our standard of review is well-settled:

In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the [orphans'] court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the [orphans'] court's order only if we conclude that the [orphans'] court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The [orphans'] judge's decision is entitled to the same deference as a jury verdict.

***In re L.M.***, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). Further,

we have stated:

Where the hearing court's findings are supported by competent evidence of record, we must affirm the hearing court even though the record could support an opposite result. We are bound by the findings of the [orphans'] court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence. The [orphans'] court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the [orphans'] court's inferences and deductions, we may reject its conclusions only if they involve errors of law or are clearly unreasonable in light of the [orphans'] court's sustainable findings.

***In re M.G.***, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citations omitted).

---

[4] We note the Agency, as well as the children's legal counsel and guardian *ad litem*, notified this Court that they agree with Attorney Hoke's conclusion that there are no meritorious grounds for appeal, and, thus, they will not be filing briefs with this Court.

Before we begin our substantive analysis, we must address the application to withdraw as counsel, which was filed by Mother's counsel, Attorney Hoke. When counsel files an *Anders* brief, this Court may not review the merits without first addressing counsel's request to withdraw. *Commonwealth v. Washington*, 63 A.3d 797, 800 (Pa.Super. 2013). We review Attorney Hoke's *Anders* brief for compliance with the requirements set forth by our Supreme Court in *Santiago*, *supra*.

[C]ounsel must:

(1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Id.* at 361.

Additionally, pursuant to *Commonwealth v. Millisock*, 873 A.2d 748 (Pa.Super. 2005) and its progeny, "[c]ounsel also must provide a copy of the *Anders* brief to [her] client." *Commonwealth v. Orellana*, 86 A.3d 877, 880 (Pa.Super. 2014). Counsel must attach to the brief a letter that advises the client of her right to: "(1) retain new counsel to pursue the appeal; (2) proceed *pro se* on appeal; or (3) raise any points that the appellant deems worthy of the court's attention in addition to the points raised by counsel in the *Anders* brief." *Id.* (internal quotation marks and citation omitted). "Once counsel has satisfied the above requirements, it is then this Court's duty to

- 17 -

conduct its own review of the [orphans'] court's proceedings and render an independent judgment as to whether the appeal is, in fact, wholly frivolous." *Commonwealth v. Goodwin*, 928 A.2d 287, 291 (Pa.Super. 2007) (*en banc*) (quotation omitted).

Here, Attorney Hoke filed a petition to withdraw, and, therein, she confirmed she sent Mother a letter informing her of her right to obtain new counsel, or to proceed *pro se*, and explained that Mother may raise any additional arguments with this Court. A copy of this letter is attached to the petition to withdraw.[5] *See* Petition to Withdraw, filed 10/21/23.

In her *Anders* brief, Attorney Hoke sets forth the relevant history of the case, as well as her reasons for concluding that Mother's appeal is wholly frivolous. Attorney Hoke states in her petition that a copy of this brief was forwarded to Mother. *See* Petition to Withdraw, filed 10/21/23. Accordingly, we conclude that Attorney Hoke has complied with the technical requirements of *Anders*, *Santiago*, and *Millisock*. We, therefore, proceed with our independent review of the record and the issues presented on Mother's behalf.

Instantly, the orphans' court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8), and (b). In order to affirm the termination of parental rights, this Court need only agree with the orphans' court's findings under any one enumerated subsection of 2511(a),

---

[5] We note Mother did not file a brief with privately retained counsel or *pro se*.

as well as 2511(b). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). After review, we conclude that the record supports termination under subsection 2511(a)(2), as well as 2511(b).

Pursuant to subsection 2511(a)(2), parental rights may be terminated, after the filing of a petition, when:

> [t]he repeated and continued incapacity, abuse, neglect[,] or refusal of the parent has caused the child[ren] to be without essential parental care, control[,] or subsistence necessary for [their] physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect[,] or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

The orphans' court relevantly indicated the following on the record at the termination hearing:

> With respect to 2511(a) and the enumerated subsections. [The orphans'] court looks back on this case and recalls at one hearing five or so months ago where the court congratulated Mother and Father on being the worse parents in the [orphans'] court's dependency docket. Mother and Father have fought their addictions unsuccessfully for a significant bulk of this case.
>
> Mother's addiction continues to rage on. The [orphans'] court noticed at the last hearing where Mother had been incarcerated for a period of time, and Mother was clean, Mother was looking the best that she had actually looked since the beginning of this case. [However, at the termination hearing, Mother tested positive for cocaine and methadone.] Mother has simply failed to meet any of her goals whatsoever. The [orphans'] court hopes that Mother can at some point overcome her addiction and get her life together. But, the court has no reason to believe that's going to happen any time in the near future.
>
> The [orphans'] court need not belabor its opinion of the testimony as to Mother, as there has been an utter and complete failure on Mother's part, including the most recent complete relapse and being AWOL since February of 2023.

This brings me to Father. Father likewise fought a war with addiction. Although the [orphans'] court does acknowledge that Father has a little bit better track record most recently. However, the court also notes that Father has continuously played games with drug testing. Despite the court's admonitions that the drug testing, like the inspections of the trailer, are opportunities for Father to prove his sobriety. Just as the home inspections are an opportunity to prove that the home is safe. I think Father is very adept and very knowledgeable as to how to play games with drug testing.

\*\*\*

The [orphans'] court notes that the last thing that the court ever wants to do is terminate parental rights. The court is hardwired to try and preserve biological parental rights as much as possible. However, when presented with unrelenting facts like the facts in this case, the [orphans'] court has no choice but to proceed with termination in the best interests of the children.

The [orphans'] court also notes that the children are doing extremely well in their recent placement and had done equally well in their prior placement, notwithstanding the problems that would flow following their visitation with [Mother and Father]. As to that issue, the [orphans'] court notes that neither parent, 14 months in, has moved passed supervised visitation….The [orphans'] court recalls situations where Father would point out to Mother outside visitation after she missed her visits and would show the children that Mother was outside, which is evidence of ongoing contact between Mother and Father, notwithstanding the PFA order that was in place.

The [orphans'] court also believes that Mother and Father have continued to have sporadic, if not more frequent, contact throughout the pendency of this case and have lied to the service providers and the Agency about that contact and took efforts to shield that contact from the Agency. I say that only as an aside, but not as a primary basis for termination.

Given Mother's lack of employment and Father's sporadic employment, the ability to create and adhere to a budget remains completely allusive. We note that Mother has made no support payments, has no job, and Father has paid $105.00 since the inception of this case.

In summary, Mother's compliance should be termed nonexistent or minuscule. It doesn't even rank as minimal.

- 20 -

Father's compliance is minimal at best.

＊＊＊

[T]he children haven't seen Mother since February or prior to February.

N.T., 7/10/23, at 101-07.

Furthermore, in its opinion, the orphans' court relevantly indicated the following:

[Regarding Subsection 2511(a)(2)], the [orphans'] court cannot stress enough that,…per the caseworker, Ms. Nangle, Mother made **no** progress on her service goals. Apart from any other element, this demonstrates that the conditions and causes of the incapacity, abuse, neglect, and/or refusal cannot or would not be remedied by Mother[.]

Mother's inability and/or refusal to correct the conditions and causes of the incapacity, abuse, neglect, and/or refusal having been established. [T]his case is replete with evidence that the children were without essential parental care, control, or subsistence necessary for their physical and mental well-being. Each of the children has medical needs. It was established that the [twins] have a great need for speech therapy, and Mother did not participate in this therapy. Thus, the [twins'] physical and/or mental well-being was neglected and/or refused. The same is true of [G.C.R.'s] physical well-being in that his lack of a kidney was not even discovered until the pre-adoptive parents…took over the parental care, control, and subsistence of the children. [G.C.R.'s] physical well-being was neglected and/or refused [by Mother].

Regarding subsistence, there was testimony that the children put on weight once they were taken out of the care of the biological parents. While there was no testimony at the termination hearing of malnutrition in the parents' care, it is clear from context that the caseworker, Ms. Nangle, spoke approvingly of the children putting on weight, which speaks to the need. Thus, through neglect or refusal, the children were without essential subsistence necessary for their physical and/or mental well-being.

The children's poor behavior following visitations with Mother speaks to how Mother's incapacity, neglect, and/or refusal caused the children to be without essential parental care and/or

- 21 -

control necessary for their mental well-being. Children who are receiving appropriate parental care and support do not, following visits with a parent, revert to bad behaviors, to include hitting and biting others, including other children, purposefully urinating on the floor of their room, and/or becoming hyper and whiney.

Though [the orphans' court suggests it has set forth ample evidence supporting termination under subsection 2511(a)(2)], the court briefly mentions other instances of repeated and continued incapacity, abuse, neglect, and/or refusal by Mother that caused the children to be without essential parental care, control, and/or subsistence necessary for their physical and/or mental well-being and that the conditions and causes of the incapacity, abuse, neglect, and/or refusal cannot or would not be remedied by Mother. Mother, who was still in the grip of her ongoing, active, and unrelenting drug addiction at the time of the termination hearing, and even tested positive for cocaine, could not provide the children with essential parental care, control, or subsistence necessary for their physical and/or mental well-being, and Mother clearly cannot remedy this. She exhausted the services of York County. Mother was inconsistent with her [supervised] visitation, and, eventually, abandoned the children. The [orphans'] court is flummoxed as to how Mother believes that she could remedy this behavior to avoid yet further mental harm to the children. Mother could not and cannot provide stable housing for the children. The children were, thus, without essential parental care necessary for their physical and mental well-being. Likewise, Mother cannot provide financial support for the children. Mother, by her demonstrated inability to make *any* forward progress on her service goals, shows she cannot or will not remedy any of the conditions and causes of the incapacity, abuse, neglect, and/or refusal that has caused the children to be without essential parental care, control, or subsistence necessary for their physical and mental well-being. Thus, the [orphans'] court was empowered to terminate Mother's rights under 23 Pa.C.S.A. § 2511(a)(2).

Orphans' Court Opinion, filed 8/30/23, at 25-28 (emphasis in original).

We find no abuse of discretion or error of law. *See In re M.G.*, *supra*.

The record demonstrates that, at nearly every turn, Mother has failed to show any initiative to act as a parent, causing the children to be without the

essential parental care or control necessary for their well-being. Because of Mother's continued course of conduct, her failure to meet any of her objectives, and her inability or unwillingness to remedy the situation, we conclude the Agency has met its burden of proof under subsection (a)(2). Accordingly, we conclude the orphans' court did not abuse its discretion in terminating Mother's parental rights to the children pursuant to 23 Pa.C.S.A. § 2511(a)(2).

Turning to subsection 2511(b), the orphans' court concluded termination would best serve the children's "developmental, physical[,] and emotional needs and welfare," and, thus, termination was in the children's best interests. *See* 23 Pa.C.S.A. § 2511(b) ("The court in terminating the rights of a parent shall give primary consideration to the developmental, physical[,] and emotional needs and welfare of the child.").

Specifically, on the record at the termination hearing, the orphans' court relevantly indicated the following:

> [Regarding the issue of parental-child bond,] the [orphans'] court notes that it is limited by the age of the children, the five-year-old twins and the three-year-old boy. The court does accept the testimony of the [guardian *ad litem*] and legal counsel that the children are well-bonded in their current placement.
>
> The court also finds as a matter of fact and law that the bond with the parents, to the extent it exists, is an exceedingly toxic bond. The court is persuaded by the children's ability to thrive with both foster parents and also persuaded by the fact that the children only go off the rails emotionally following visits with either [Mother or Father]. What's clear to the court is that these [biological] parents are a long way from being in a position to take care of themselves let alone parent their children.

- 23 -

N.T., 7/10/23, at 106.

Moreover, in its opinion, the orphans' court relevantly indicated the following:

> The court does not deny that there are bonds of sorts between Mother and the children. However, the [orphans'] court found that the bonds between Mother and the children are and were toxic bonds. As already discussed, the caseworker, Ms. Nangle, guardian *ad litem*, Attorney Worley, and legal counsel for the children, Attorney Moore, clearly felt that the bond between children and the pre-adoptive parents was what we would consider a true parent-child bond. The [pre-adoptive foster parents] dealt with the mechanical demands that are dictated by the parent-child bond, which is best illustrated by [their], and *not* the biological parents, addressing the children's medical needs. However, the [pre-adoptive foster parents] also fulfill the emotional bonds of the children. It spoke volumes that the children did not inquire about their biological parents. It spoke volumes that the children had poor reactions to visitations with their biological parents that, unsurprisingly, trailed off as the children's time with the [pre-adoptive foster parents] lengthened, and as Mother disappeared from their lives, and, thus, had no visitation for a stretch of months. The caseworker, Ms. Nangle, made it clear that these children reach out to the [pre-adoptive foster parents] when they have a childhood need that only a parent can meet. This stands in stark contrast to the toxic relationship the children have with Mother, who no doubt cares for them in her own way, results in the children exhibiting poor behavior from the minimal *supervised* contact that they had with Mother.
>
> As we have stated in other cases, while it is a lamentable state of affairs, the [orphans'] court concluded based on all of the evidence during the life of this case, that the children were primarily bonded *and healthily so* with [the pre-adoptive foster parents]. The best interests of the children, coupled with their need for permanency, demanded termination.

Orphans' Court Opinion, filed 8/30/23, at 31-32 (emphasis in original).

We find no abuse of discretion. ***See In re M.G.***, ***supra***. The record, in

particular the testimony of the caseworker, Ms. Nangle, supports the orphans' court's determination. *See In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa.Super. 2008) (when conducting bond analysis, a court is not required to use expert testimony); *In re A.R.M.F.*, 837 A.2d 1231 (Pa.Super. 2003) (holding the court properly terminated parental rights where decision was based, in part, on social worker's and caseworker's testimony children did not share significant bond with biological parents and were well bonded with foster parents). Moreover, the guardian *ad litem* and the children's legal counsel echoed Ms. Nangle's testimony that the children were bonded with the pre-adoptive foster parents.

Finally, our review of the record does not reveal any non-frivolous issues overlooked by Attorney Hoke. After our independent review, we conclude that the evidence presented supports the orphans' court's decrees involuntarily terminating Mother's parental rights pursuant to subsections 2511(a)(2) and (b). *See In re Z.P.*, 994 A.2d 1108, 1115 (Pa.Super. 2010) (absent abuse of discretion, error of law, or insufficient evidentiary support for the lower court's decision, decree in termination of parental rights proceeding must stand). Thus, we affirm the orphans' court's decrees and grant Attorney Hoke's petition to withdraw her representation.

Decrees affirmed. Motion to withdraw granted.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>12/27/2023</u>